**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| A.D. an individual, | |
| Plaintiff, | |
| vs. | Case No.: 2:22-cv-00644-JES-NPM |
| MARRIOTT INTERNATIONAL, INC.; and | SECOND AMENDED COMPLAINT |
| CHMB FLORIDA HOTEL MANAGER, LLC, | DEMAND FOR JURY TRIAL |
| Defendant(s). | |

**SECOND AMENDED COMPLAINT**

COMES NOW the Plaintiff A.D. ("Plaintiff" or "A.D."), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

**SUMMARY**

1. For decades, criminal sex traffickers have brazenly operated in and out of hotels throughout this country. Victims of sex trafficking are taken to hotel and motel rooms to be repeatedly trafficked, sexually assaulted, demeaned and left with multiple unaddressed injuries, while hotel operators and hospitality giants pay lip service to campaigns against sex trafficking, turning a blind eye to criminal misconduct and collecting profits from the criminal misconduct at the

expense of human life, human rights, and human dignity.

2.      Defendant Marriott International, Inc. ("Marriott") knows and has known for years that sex trafficking and prostitution repeatedly occurred and continues to occur under their brand flag and at their branded hotel locations.

3.      Defendant CHMB Florida Hotel Manager, LLC ("CHMB Florida") knows and has known for years that sex trafficking and prostitution repeatedly occurred and continues to occur at its Fairfield Inn® & Suites Naples by Marriott ("Fairfield") hotel located at 3804 White Lake Boulevard, Naples, Florida 34117 where A.D. was trafficked.

4.      Defendants Marriott and CHMB Florida have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[1]

5.      Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for Defendant CHMB Florida

---

[1] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3

as an owner of a Marriott-branded hotel and Defendant Marriott, who is a major player in the hospitality industry. The presence of sex trafficking and sexual exploitation in hotels is a frequent and obvious occurrence and numerous well-researched training and toolkits have been published over the last decade to help hotel staff in every position to identify the signs.[2]

6.      Obvious signs of sex trafficking at a hotel, including Defendants' brand hotels, may include: an excess of condoms in rooms; individuals carrying or flashing large amounts of cash; excessive amounts of cash stored in the room; renting two (2) rooms next door to each other; declining room service for several consecutive days; significant foot traffic in and out of room(s); men traveling with multiple women who appear unrelated; women known to be staying in rooms without leaving; women displaying physical injuries or signs of fear and anxiety; guests checking in with little or no luggage; hotel guests who prevent another individual from speaking for themselves; or a guest controlling another's identification documents.[3]

7.      Hotel staff who have undergone training are more aware of sex

---

[2] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*. Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[3] *Id. See also*, Shea M. Rhodes, Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), available at https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf

trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[4]

8.     Hotel brand companies such as Marriott were obligated to adopt policies and procedures related to sex trafficking and enforce these policies and procedures as brand standards and hotel operation standards.

9.     Hotel owners such as CHMB Florida were obligated to implement policies and procedures related to the prevention of sex trafficking pursuant to brand standards as well as local and state laws.

10.     Rather than taking timely and effective measures known to prevent or combat sex trafficking and forced prostitution occurrences on their hotel properties, Defendants hewed to a common policy of harboring known and suspected human traffickers in exchange for financial and other benefits and actively ignored signs of ongoing human trafficking in their hotels.

11.     With proper training and the implementation of reasonable security measures, Defendants could have prevented regular sex trafficking in the hotels they own, operate, supervise, franchise, and/or brand under their flag, including the Fairfield hotel where Plaintiff was trafficked.

12.     This action for damages is brought by the Plaintiff, a survivor of sex

---

[4] CNN Wire Staff, U.S. human trafficking report includes U.S. cases for first time, CNN.com (Jun. 14, 2010), *available at* https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#

trafficking hereinafter identified by her initials A.D., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA").

13. A.D. was repeatedly sexually exploited, demeaned and left with multiple unaddressed injuries, while Defendants turned a blind eye to clear and accessible red flags and indicators of her trafficking and continued to benefit financially and otherwise.

14. Between approximately February 2012 through August 2012, Plaintiff was repeatedly sold and exploited for commercial sex at hotels throughout Central Florida.

15. In approximately July 2012, Plaintiff was repeatedly sold and exploited for commercial sex at the Fairfield hotel.

16. At the Fairfield hotel, A.D. was trafficked for commercial sex by Trafficker 2 through force, fraud, and coercion, while Defendants turned a blind eye and continued to benefit.

17. At the Fairfield hotel, A.D.'s traffickers advertised A.D. for sex on various websites known for trafficking and sexual exploitation, whereby Defendants, through their agreements, terms, or policies related to internet and software, provided open access to these known websites permitting traffickers and buyers to enable, facilitate, and otherwise assist in the harboring of A.D. for the

purpose of sex trafficking.

18.     With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures and refusals to act, mandate, establish, execute, and/or modify their anti-trafficking efforts at the Fairfield hotel, A.D. was continuously sex trafficked, sexually exploited, and victimized repeatedly at the Fairfield hotel.

19.     The Plaintiff brings this action pursuant to the TVPRA, 18 U.S.C. § 1595, against the Defendants who participated in a hotel operating venture and knowingly benefited from this venture through room rentals, profits, third party fees, and the value of the "good will" of the Marriott® brand. The venture knew or should have known that they were profiting from sex trafficking, including the sex trafficking of A.D., in violation of the TVPRA. Defendants turned a blind-eye to knowledge regarding anti-trafficking efforts, including local advances made by local organizations, and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking.

## **PARTIES**

20.     **Plaintiff A.D.** is a natural person who resides in Collier County, Florida.

        a. The Plaintiff is a victim of trafficking pursuant to 18 U.S.C. § 1591 and a victim of a "severe form of trafficking" as it is defined under

6

22 U.S.C. § 7102 (16).

b. Due to the sensitive, private, and potentially retaliatory nature of the allegations, this Court has granted Plaintiff A.D.'s request to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter.[5]

21.    **Defendant Marriott International, Inc. ("Marriott")** is one of the largest hotel franchising companies in the world with over 7,000 branded properties across 131 countries.[6] Marriott offers public lodging services directly and through its affiliates, subsidiaries, and franchises. Defendant Marriott is a Delaware corporation with its principal place of business located at 10400 Fernwood Road, Dept. 324.13, Bethesda, Maryland 20817.  It can be served by its registered agent at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

a. Marriott is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida; derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the

---

[5] *A.D. v. CorePoint Lodging*, No. 2:22-cv-00095, ECF No. 159.

[6] We Are Marriott International, *A Brand Leader*, https://www.marriott.com/marriott/aboutmarriott.mi (last visited Jul. 23, 2021).

Fairfield hotel; has caused indivisible injuries to A.D. in Florida; and profited from illegal commercial sex trafficking involving Plaintiff at its hotel.

22. **Defendant CHMB Florida Hotel Manager, LLC (hereinafter "CHMB Florida")**, doing business as the Fairfield Inn® & Suites by Marriott Naples ("Fairfield"), is a Delaware limited liability company and is one of Defendant Marriott's branded properties. Defendant CHMB Florida may be served with service of process by serving its registered agent, NRAI SERVICES, INC, 1200 South Pine Island Road, Plantation, FL 33324.

23. Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

24. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States and this Court has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to

claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action was brought.

26.     Defendants have submitted to the jurisdiction of Florida and have purposefully availed themselves of the privilege of conducting acts in Florida through their dominion and control over their respective brands with brand subsidiaries, brand property subsidiaries, and operating hotels, and day-to-day operation of the hotels, and thus, invoking the benefits and protections of the laws in Florida; Florida has an equally strong interest in protecting and assuring the safety of persons within its State.

<u>**SEX TRAFFICKING UNDER FEDERAL LAW**</u>

27.     The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation

9

of this chapter." 18 U.S.C. § 1595(a).[7]

28.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."

<strong><u>FACTUAL ALLEGATIONS</u></strong>

### A.  PARTICIPATION IN A VENTURE: Defendants Marriott and CHMB Florida Participate in a Hotel Operating Venture

29.     Defendant Marriott participated in a hotel operating venture that included Defendant CHMB Florida. The venture also included hotel staff and employees at the Fairfield hotel, including but not limited to, the maintenance workers, housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants operate, supervise, and/or manage the Fairfield hotel where A.D. was trafficked.

30.     Defendant CHMB Florida owns the Fairfield Inn® & Suites by Marriott Naples ("Fairfield") located at 3804 White Lake Blvd., Naples, Florida and operated the hotel pursuant to the franchise agreement it entered into with

---

[7] On January 5, 2023, Congress once again expanded the scope of liability for civil beneficiary claims pursuant to Section 1595 of the TVPRA.

Defendant Marriott.

31.     Upon information and belief, in approximately 2006, Defendant CHMB Florida entered into a franchise agreement with Defendant Marriott in connection with the management and operation of the Fairfield hotel.

32.     Marriott was in an agency relationship with CHMB Florida offering public lodging services in the hotel. This agency relationship was established through Defendant Marriott's exercise of an ongoing and systemic right of control over Fairfield hotel by Defendant Marriott's operations, including the means and methods of how Fairfield hotel conducted daily business through one or more of the following actions:

> a. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;
>
> b. providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;
>
> c. providing new hire orientation on human rights and corporate responsibility;
>
> d. providing training and education to Fairfield Inn® branded hotels through webinars, seminars, conferences, and online portals;

e. providing and controlling customer review and response platforms;

f.  hosting online bookings on Defendant Marriott's domain;

g. requiring Fairfield Inn® branded hotels to use Defendant Marriott's customer rewards program;

h. requiring Fairfield Inn® branded hotels to use Defendant Marriott's property management software;

i. requiring Fairfield Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

j. providing IT support for all property management systems, owned, operated and required by Marriott;

k. setting employee wages;

l. making employment decisions;

m. advertising for employment;

n. sharing profits;

o. requiring Fairfield Inn® branded hotels to use Defendant Marriott's property management software;

p. requiring Fairfield Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

q.  providing IT support for all property management systems, owned, operated and required by Marriott;

r.  standardized training methods for employees;

s.  building and maintaining the facility in a manner specified by the owner;

t.  standardized or strict rules of operation;

u.  regular inspection of the facility and operation by owner;

v.  fixing prices; or

w. other actions that deprive Fairfield Inn® branded hotels of independence in business operations.

33.  An apparent agency also exists between Defendant Marriott and Fairfield hotel. Defendant Marriott held out Fairfield Inn® branded hotels to the public as possessing authority to act on its behalf. Defendant Marriott clothed the Fairfield hotel with apparent authority to act for Defendant Marriott in the following ways: by requiring the use of Marriott signs, providing Marriott branded stationery, requiring the use of Marriott's website and Marriott's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Marriott guest rewards programs. On information and belief, Defendant Marriott's conduct reasonably led A.D.'s perpetrator to believe that the Fairfield hotel had the authority it purported to have, and A.D. was injured as a

result.

34.     As the principal and as a hotel operator, Marriott controls the training, policies, and decisions on implementation and execution of policy for its branded properties, including the Fairfield hotel where A.D. was trafficked.

35.     The Fairfield hotel's website is hosted at Marriott's domain, www.marriott.com.

36.     When staying at Marriott branded hotels, guests receive Marriott Rewards for bookings.

37.     Defendant Marriott exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Fairfield hotel where A.D. was trafficked for sex.

38.     Defendant Marriott exercises day-to-day control over the Fairfield hotel, as well its lax policies and procedures with respect to the prevention of sex trafficking on its hotel properties, including the Fairfield hotel, through its brand standards and retains control over the Fairfield hotel through its corporate structure, including its franchise agreements, brand standards, licensing agreements, and/or operating agreements.

39.     Marriott makes decisions that directly impact the operations and maintenance of their branded hotels, including the Fairfield hotel.

40.     Marriott is the principal in an agency relationship with the Fairfield

14

hotel.  In addition to Marriott's liability under TVPRA section 1595, Marriott is vicariously liable for the acts and/or omissions of the staff at its Fairfield hotel.

41.     The Fairfield hotel where A.D. was trafficked has apparent agency for Marriott so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

42.     Defendant Marriott has ratified the actions and inactions of the Defendant CHMB Florida.

43.     Defendant Marriott and CHMB Florida are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the Fairfield hotel where the Plaintiff was trafficked for sex. Defendant Marriott and CHMB Florida each share the common policies and practices complained of herein.

44.     Defendant Marriott and CHMB Florida jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

45.     As an integrated enterprise and/or joint employer, Defendant Marriott and CHMB Florida are separately and jointly responsible for compliance with all applicable laws.

46.     As an integrated enterprise and/or joint employer, Defendant Marriott and CHMB Florida are jointly and severally liable for any damages

15

caused by their employees.

47.    Defendants Marriott and CHMB Florida are considered employers under federal labor regulations.

48.    Upon information and belief, Marriott controls a uniform and required reservation and marketing system, credit processing system, and training and policy on brand standards, including policies on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Marriott, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Fairfield hotel where A.D. was trafficked.

49.    At all relevant times, Defendant CHMB Florida was involved in the staffing and operation of the Fairfield hotel where A.D. was trafficked for sex. Defendant CHMB Florida managed the hotel pursuant to a franchise agreement with Defendant Marriott and Marriott's brand standards. Directly and through its franchise agreement with Defendant Marriott, Defendant CHMB Florida directly offered public lodging services at the Fairfield hotel where A.D. was trafficked for

16

sex.

50.    As a hotel owner, Defendant CHMB Florida participated in a hotel operating venture that included hotel staff and employees who were closely involved with the daily management and operations of the hotel pursuant to Defendant Marriott's brand standards, franchise agreements, licensing agreements, and operating agreements.

51.    At all relevant times, Defendant CHMB Florida managed, supervised, directed, and/or operated the Fairfield hotel through its brand standards and franchise agreement. Because Marriott operated the Fairfield hotel where A.D. was trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals A.D. was victimized in.

52.    Defendant Marriott and Defendant CHMB Florida participated in a hotel operating venture in connection with the management and operating of the Fairfield hotel involving risk and potential profit.

## B. KNEW OR SHOULD HAVE KNOWN:
**Defendants Marriott and CHMB Florida Knew or Should Have Known Their Hotel Business Venture Violated the TVPRA**

53.    At all times that Plaintiff was trafficked at the Fairfield hotel, Defendants refused or failed to require any Human Trafficking training despite

17

knowing that trafficking was occurring.

54.    Defendant Marriott and Defendant CHMB Florida knew or should have known that forced prostitution and trafficking was taking place well before Plaintiff was trafficked.

55.    Upon information and belief, between at least 2008 to 2012, Defendant Marriott held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

56.    Upon information and belief, between at least 2008 to 2012 Marriott held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

57.    Upon information and belief, during at least 2008 to 2012, emails were exchanged by employees of Marriott that related to sex trafficking in hotels, including CHMB Florida's Fairfield hotel.

58.    Marriott represents that it considers guest safety and security important and requires the brand hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[8]

59.    Defendant Marriott maintains data in server logs and internet files that could be used to help prevent human trafficking, but it fails to use this data

---

[8] *See Marriott Int'l Inc. Human Rights Policy Statement* (July 2017), https://www.marriott.com/marriottassets/Multimedia/PDF/Corporate/HumanRig htsStatement.pdf

for the prevention of human trafficking.

60.     Defendant Marriott had actual and/or constructive knowledge of sex trafficking, including A.D.'s sex trafficking and victimization, occurring on its branded property via the following:

a.  Defendant Marriott owns, supervises, or operates the Fairfield hotel located at 3804 White Lake Boulevard, Naples, Florida 34117 through its brand standards, franchise agreements, operating agreements, and/or licensing agreements. Marriott failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

b.  Defendant Marriott voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnership with ECPAT, and its activities with the AHLA and other trade organizations. However, Marriott failed to implement its own policies and those recommended to it by the above-mentioned advocacy organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of A.D.[9]

---

[9] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

c. Upon information and belief, Plaintiff alleges that Marriott implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

d. Defendant Marriott had actual knowledge of sex trafficking occurring on its branded hotel properties because Marriott and CHMB Florida knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Marriott and CHMB Florida allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Fairfield hotel. Marriott and CHMB Florida facilitated the trafficking through its practices, policies, and procedures. Marriott and CHMB Florida failed to take appropriate action to prevent the trafficking of individuals for sex so that Marriott and CHMB Florida could continue to profit from the business that trafficking brings, including business from out-of-state.

e. Defendant Marriott had constructive knowledge of sex trafficking occurring on its branded hotel properties because Marriott and

CHMB Florida knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Marriott and CHMB Florida allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Fairfield hotel. Marriott and CHMB Florida facilitated the trafficking through its practices, policies, and procedures. Marriott and CHMB Florida failed to take appropriate action to prevent the trafficking of individuals for sex so that Marriott and CHMB Florida could continue to profit from the business that trafficking brings, including business from out-of-state.

f.  Marriott knew or should have known that the Fairfield hotel where Plaintiff A.D. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.D. was trafficked.

g.  Marriott brand hotel properties know and have known for more than a decade that criminal sex trafficking of adults and children repeatedly occurs on their properties throughout the country.

Rather than take timely and effective measures to prevent human trafficking, Marriott brand hotels, and their respective parent companies, have instead failed to address the open and obvious presence of human trafficking on hotel properties and continue to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

h. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Marriott has repeatedly ignored these actions.

i. Upon information and belief, Defendant Marriott could, and in many instances did, track and control data regarding guest preferences and other information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Marriott's management and control and included all of the indicia of A.D.'s trafficking. This data included the details of A.D.'s check-in, the internet activity associated with her reservation, including access to Backpage.com to post advertisements from the hotel, access to other online websites known for sexual exploitations, her

location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book additional dates, and the spike in requests for towels and other items from inventory.

61. Given Defendant Marriott's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Fairfield hotel, Defendant Marriott breached its duties in the following ways:

    i.    did not adequately distribute information to assist employees in identifying human trafficking;

    ii.    failed to mandate a process for escalating human trafficking concerns within the organization;

    iii.    failed to mandate managers, employees, or owners attend training related to human trafficking;

    iv.    failed to provide new hire orientation on human rights and corporate responsibility;

    v.    failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi.    failed to develop and hold or require ongoing training sessions on human trafficking; or

vii.   failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

viii.  failed to evaluate universal reservation systems for suspicious booking activities;

ix.    failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x.     failed to ban cash or prepaid credit cards as payment; and

xi.    failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

62.    Upon information and belief, Defendant Marriott requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that Defendant Marriott specifies and requires.[10]

---

[10] See https://blueportwireless.com/gpns-certified/ ("On May 22, 2013, Blueport Wireless becomes the first vendor to be certified in the 2013 Marriott Global Property Network Standard."); *see also*

63. Upon information and belief, Defendant Marriott requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Marriott access to the internet data.

64. Defendant Marriott states in its privacy policy that it collects the following categories of information from hotel guests: contact information such as name, gender, postal address, telephone number, email address; financial information such as credit and debit card number or other payment data; date and place of birth; membership or loyalty program data; social media account IDs, profile photos or data made available by linking social media and loyalty accounts; biometric data; images and video and audio data via security cameras in public areas and body-worn cameras carried by loss prevention officers and other security personnel; and other technological data including a customer's browser or device, data collected when downloading or using an app; cookies that collect data such as time spent on online services, pages visited, and IP addresses.[11]

65. Defendant Marriott retains and can view internet access, which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring

https://www.deepbluecommunications.com/industries/hotel-wifi/marriott/ ("Deep Blue has been a Marriott GPNS Certified Hotel WiFi Vendor since 2011.").

[11] *See* Marriott International, Inc.'s Privacy Policy, *available at* https://www.marriott.com/about/privacy.mi#data-covered

described above.

66.    Marriott's centralized property management system[12] also gains Marriott access to hotels guest information registration, including names, date of booking, and length of stay.

67.    Upon information and belief, Defendant Marriott can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays are requested.

68.    Upon information and belief, Defendant Marriott has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.[13]

69.    Upon information and belief, Defendant Marriott can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on

---

[12] *See, e.g.,* Marriott International Selects Cloud-based MICROS OPERA as Its Next-Generation Property Management System for all North America Properties, *available at* https://www.prnewswire.com/news-releases/marriott-international-selects-cloud-based-micros-opera-as-its-next-generation-property-management-system-for-all-north-america-properties-204731811.html

[13] *See* Marriott to Pay $600,000 to Resolve Wi-Fi Blocking Investigation, *available at* https://assets.documentcloud.org/documents/1308852/doc-329743a1.pdf; *see also, e.g.,* https://traveltips.usatoday.com/hotels-track-internet-usage-111659.html ("the hotel's server usually has a log file that lists every connection the server makes for its users while they browse using its network.").

Backpage.com.

70.    Upon information and belief, and contrary to ECPAT best practices, Defendant Marriott failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

71.    Upon information and belief, Defendant Marriott's ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Fairfield hotel where Plaintiff was trafficked for sex.

72.    Despite access to information comprising clear sex trafficking indicators, Defendant Marriott continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought Plaintiff.

73.    Upon information and belief, Defendant Marriott monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

74.    Upon information and belief, Defendant Marriott provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Marriott controls and houses this collective data from all branded properties.

75.    For years, Defendant Marriott has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically

27

occurs on its Fairfield Inn® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.D. at Fairfield hotel that forms the basis of this complaint. For example:

a. In June of 2006, a child prostitution ring was uncovered at a Marriott Fairfield Inn in Phoenix, Arizona when the Federal Bureau of Investigations received a tip from the National Center for Missing and Exploited Children.[14]

b. In May of 2007, a man was arrested for numerous drug charges after police received a complaint about the odor of drugs coming from his Manhattan, Kansas Fairfield Inn hotel room.[15]

c. In Oak Creek, WI, "[a]ccording to police reports, an employee from the Fairfield Inn called the police, saying that several men were entering and leaving a room in the building, and suspected there might be a prostitution operation taking place inside."[16]

d. In Fairview Township, PA, "[t]he woman, later identified as

[14] *Children Prostitution Ring is Busted in NE Phoenix*, Arizona Republic, Jun. 24, 2006, at pg 40

[15] *Police,* The Manhattan Mercury, May 31, 2007, at pg 2

[16] *Prostitution Operation Busted at Fairfield Inn: Report*, PATCH MEDIA (Mar. 31, 2018) *available at* https://patch.com/wisconsin/oakcreek/prostitution-operation-busted-fairfield-inn-report

Dowdell, agreed to meet an undercover detective at the Fairfield Inn and Suites. When Dowdell arrived at the room, she looked around the entire interior and then asked the detective for $180. The detective gave her $200, and she hugged him and patted him down."[17]

    e.  In April of 2012, a woman sued a Marriott Hotel in Boston, Massachusetts after a man responded to a craigslist advertisement soliciting sex and killed her daughter within the hotel in a violent attack. The woman said hotels should be doing more to curb prostitution.[18]

76.    Additionally, Defendant Marriott has been aware of sex trafficking and guest safety issues on Fairfield Inn® brand properties through publicly available websites such as www.tripadvisor.com, www.expedia.com, and www.booking.com. Online reviews and public newspaper articles show the pervasiveness of customer reported sex trafficking and guest safety issues on Fairfield Inn® brand properties and Defendant Marriott's inattentiveness, for

---

[17] *Wrightsville man, two women busted for prostitution,* YORK DAILY RECORD (Oct. 18, 2016) *available at* https://www.ydr.com/story/news/crime/2016/10/18/more-alleged-prostitutes-busted-hotels-cops-say/92352000/

[18] Mother of Craigslist victim sues Marriott, THE BOSTON GLOBE (Apr. 2012), *available at* https://www.bostonglobe.com/metro/mother-woman-slain-craigslist-killer-sues-marriott-hotel-chain/LxuP2jZtY59DsxMTZXJ09H/story.html

example:

    a.  In May of 2021, a reviewer brought attention to a safety issue at the Fairfield Inn and Suites in Naples: "side door lock wasn't operational so basically anyone could access to (sic) the hotel."[19]

    b.  In June of 2021, a reviewer mentioned that during their stay, their vehicle was broken into. The police officer told the reviewer that due to poor guest safety measures and lack of security, the hotel was a "prime target for smash and grab thieves" and that the security door at the far end of the hotel would not latch, allowing anyone to come into the hotel.[20]

    c.  In November of 2021, a reviewer described staff at the Fairfield Inn and Suites in Naples as "rude and uninformed," indicating that the back-entrance door stayed open at all times, that safety measures were ignored, and that staff remained indifferent to guest safety and questions.[21]

---

[19] Review of Fairfield Inn and Suites by Marriott Naples (May 27, 2021), available at https://www.booking.com/hotel/us/fairfield-inn-and-suites-by-marriott-naples-two.html#tab-reviews

[20] Review of Fairfield Inn and Suites by Marriott Naples (Jun. 21, 2021), available at https://www.expedia.com/Naples-Hotels-Fairfield-Inn-Suites-By-Marriott-Naples.h2733223.Hotel-Information?pwaDialog=reviews-property-reviews-1

[21] Review of Fairfield Inn and Suites by Marriott Naples (Nov. 1, 2021), available at https://www.booking.com/hotel/us/fairfield-inn-and-suites-by-marriott-naples-two.html#tab-reviews

77.     Upon information and belief, Defendant Marriott regularly reviews and monitors customer reviews of its properties posted on various online review websites such as yelp.com, Travelocity, and TripAdvisor, including the Fairfield hotel where Plaintiff was trafficked.

78.     Upon information and belief, Defendant Marriott monitors customer reviews and complaints for all brand properties, including the Fairfield hotel.

79.     Upon information and belief, the branded properties like Fairfield hotel depend on Defendant Marriott for notification of negative customer reviews.

80.     Upon information and belief, Defendant Marriott, not the branded properties, house and control the data regarding customer reviews.

81.     Defendants have been on notice of repeated incidences of sex trafficking occurring at their brand hotels, yet they failed to take the necessary action to meaningfully address sex trafficking and still persist in failing to take the necessary action to meaningfully address sex trafficking at their hotels.

82.     Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[22]

83.     Upon information and belief, Defendants Marriott and CHMB Florida

---

[22] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009);
*Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007).

had actual or constructive knowledge of law enforcement in close proximity to the Fairfield hotel. For example:

    a. In November 2011, two East Naples men were charged with procuring minors for prostitution and lewd lascivious battery after young girls reported to police that they were being coerced into performing sexual acts with random men on several occasions.[23] A third male was later identified and booked on the same charges.[24] These actions took place fifteen minutes from Defendants' Fairfield hotel.

    b. In January 2013, federal agents made thirteen arrests in Naples in regards to a sex trafficking ring that exploited women from Naples to North Carolina.[25]

    c. In February 2018, a Lee County Judge resigned after being arrested for soliciting prostitution and resisting arrest during a police sting in Naples.[26]

---

[23] Deputies: 2 East Naples men solicit minors for prostitution, Naples News Nov. 27, 2011, *available at* https://archive.naplesnews.com/news/crime/deputies-2-east-naples-men-solicit-minors-for-prostitution-ep-390595914-342737702.html/

[24] Third arrest made in underage prostitution operation, Naples Daily News, Dec. 1, 2011, *available at* https://archive.naplesnews.com/news/crime/third-arrest-made-in-underage-prostitution-operation-ep-390562791-342732172.html/

[25] *Feds Make 13 Arrests in Naples, Florida-to-North Carolina Sex Trafficking Ring*, The Naples Daily News, Jan. 18, 2013, at pg. 4A.

[26] *Judge Accused of Soliciting Prostitution, Resisting Arrest Resigns*, Wink News, Feb. 13, 2018, *available at*

84.    The above is just a mere sampling of information that Plaintiff was able to presently find in the public domain. Plaintiff contends there will be more information of this nature but will only be accessible during discovery.

**Defendants Marriott and CHMB Florida Knew or Should Have Known that Their Hotel Business Venture Facilitated the Sex Trafficking of Plaintiff A.D.**

85.    In November of 2011, A.D. met a man who she was interested in ("hereinafter referred to as "Trafficker 2"). He took advantage of her innocence and forced her into a sexual encounter. Trafficker 2 subsequently courted her and manipulated her into thinking they were in love. While "dating," Trafficker 2 would manipulate A.D. into numerous non-consensual sexual encounters; forced her to take drugs; and take the blame for his criminal acts. Trafficker 2 would consistently take advantage of A.D. and would soon traffick her in hotels throughout Central Florida.

86.    After months of "dating," Trafficker 2 suggested A.D. move in together. Because he was a convicted felon and registered sex offender, he forced A.D. to enter into a lease agreement. In order to make money to sustain their life together, Trafficker 2 suggested A.D. work to make extra money.

87.    Under the ruse of a modeling job advertised on Backpage.com, Trafficker 2 forced A.D. to work. During her "interview" for the modeling job at a

---

https://winknews.com/2018/02/13/judge-accused-soliciting-prostitution-resisting-arrest-resigns/

33

hotel, A.D. met a man (hereinafter referred to as "Trafficker 1") who raped her into submission.

88.   Thereafter, Trafficker 2 coerced or otherwise forced A.D. into engaging in commercial sex acts by using threats of force, fraud, coercion, and a combination of these means.

    a.  Trafficker 2 used threats of physical violence to force A.D. into engaging in commercial sex acts. Trafficker 2 would physically assault her if she did not adhere to his control and engage in commercial sex acts.

    b.  Trafficker 2 would become violent if she told him she did not want to participate in his criminal activity.

    c.  Trafficker 2 always carried a gun, which frightened A.D., and on various occasions he pointed a loaded gun to her head or under her chin.

    d.  Trafficker 2 often choked A.D. to remind her that he was in control and to make her call him "daddy."

    e.  Trafficker 2 forced A.D. to take drugs as a means to control her and make her complacent to being sexually assaulted by dozens of men daily.

    f.  A.D. was always under the control of her trafficker. When A.D. was

with a sex buyer, Trafficker 2 would wait outside in the parking lot overlooking the hotel room window or would hide in the closet of the hotel room. Even when A.D. slept, Trafficker 2 kept his arm draped around her stomach so if she moved he could feel it.

g.  Trafficker 2 accompanied A.D. everywhere she went and always insisted on driving her where she needed to go.

89.     While victimized by her traffickers, A.D. was subjected to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotel property in approximately July of 2012.

90.     Plaintiff A.D. was first subjugated to trafficking at the Fairfield hotel by Marriott, in approximately July of 2012.

91.     Trafficker 2 advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

92.     Employees and staff at the Fairfield hotel would let A.D. pay for the room with cash, but required a credit card for the room deposit. A.D. would pay the deposit with a prepaid credit.

93.     At the direction of Trafficker 2, A.D. used her personal identification to book the rooms and check in.

94.     Up to 5 to 10 sex buyers per stay would arrive at the Fairfield hotel

where A.D. rented rooms at the direction of Trafficker 2 for the purpose of selling A.D. for sex. A.D. was sexually exploited and abused numerous times at the Fairfield hotel.

95.    Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

a. At the direction of Trafficker 2, A.D. checked into the hotel under her name and paid for the room in cash. She would only pay for one night at a time. Each morning, for the duration of their stay, A.D. would approach the front desk, in her obvious drugged and deteriorated state, wearing provocative clothing, and would ask the front desk clerk what the daily room rate was for that day before paying in cash provided by Trafficker 2 to extend their stay for another night.

b. A.D. frequently appeared throughout the hotel and hotel premises exhibiting visible signs of sex-trafficking malnourished, bruised, drugged, and clothed in inappropriate attire.

c. A.D. and Trafficker 2 ate breakfast at the hotel, and collectively, their appearance—Trafficker 2, a thug with visible tattoos from the neck down and dressed like a gangster with A.D. visibly appearing

malnourished, clothed in inappropriate attire, drugged and in a disheveled state—was noticeable and was pronounced in an area with families and business professionals.

d. Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

e. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

f. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

g. A continuous procession of men entering and leaving A.D.'s room that would have to enter through the main entrance of the hotel and pass by the front desk;

h. Excessive requests for sheets, cleaning supplies, towels, and room service;

i. The personal relationship between various hotel staff and A.D.'s trafficker; and

j. The direct employee encounters with A.D. and Trafficker 2 inside the Fairfield hotel.

96. Defendants knew, or should have known, that A.D. was being

37

trafficked because A.D. constantly entertained traffic to appease her traffickers' daily quotas and their behavior indicated they were using the Defendants' hotel for his illegal sex trafficking activities.

97.     Despite such constructive knowledge, Defendants knowingly or negligently provided lodging in which to harbor A.D. for sex trafficking.

98.     Defendants had the opportunity to stop A.D.'s traffickers and offenders like them from victimizing A.D. and others like her. Instead, Defendants actively ignored common signs of sex trafficking and refused to take any reasonable measures to stop sex trafficking from occurring in their hotels.

99.     Defendants refused to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

100.    Marriott through its agency relationship with CHMB Florida would have constructive knowledge of A.D. 's trafficking at the Fairfield hotel.

101.    Evaluating the above facts and circumstances in totality, Defendants Marriott and CHMB Florida had actual or, at a minimum, constructive knowledge that the rental of rooms was for the purpose of sex trafficking A.D., in violation of the TVPRA.

## C.  KNOWING BENEFIT:
### Defendants Marriott and CHMB Florida Knowingly Benefited
### From Their Hotel Business Venture

102.  Upon information and belief, CHMB Florida was apprised of instances of sex trafficking at its Fairfield hotel via its corporate parent or franchisor, Defendant Marriott. In addition, CHMB Florida had personal knowledge of the trafficking of Plaintiff A.D. at the Fairfield hotel. As outlined in further detail below, CHMB Florida employees and staff openly observed signs of trafficking, did not aid Plaintiff, and thereby had constructive and/or actual knowledge of the trafficking of A.D. at the Fairfield hotel. Despite these open and obvious signs, CHMB Florida profited and received revenue, a percentage of which it then provided to Defendant Marriott, directly from Plaintiff's trafficking via the rooms rented by her traffickers and rooms rented at the direction of her traffickers.

103.  Through Marriott's relationship with the staff at the Fairfield hotel where A.D. was trafficked and where traffickers of Plaintiff were guests or visitors, Marriott knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known violated the TVPRA through, *inter alia*, royalty payments, licensing fees, franchise fees and dues, reservation fees, and percentages of the gross room revenue which Marriott is entitled to under corporate structure and relationship with its branded hotels

39

under the agreements.

104.   Through its brand standards, franchise agreements, licensing agreements, and operating agreements, Defendant Marriott controls the training, procedures, and policy for the Fairfield hotel where A.D. was trafficked, which bears its brand name. Through its brand standards and franchise agreements, Marriott knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known facilitated the sex trafficking of Plaintiff through the room rentals in which A.D. was trafficked.

105.   Through Defendants CHMB Florida and Marriott's continuous business venture of renting hotel rooms, which were used for trafficking A.D. at the Fairfield hotel, Defendant CHMB Florida knowingly benefited or received something of value from activity that its facilitation of or participation in a venture which it knew or should have known had violated the TVPRA through the rental of rooms where A.D. was trafficked.

106.   Defendants knew, or should have known, that A.D. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because A.D.'s trafficker frequented the Defendants' hotel.

107.   Defendant Marriott receives revenue from the money generated by the operations of the Fairfield hotel, including revenue from the reservation fees

charged for the room in which Plaintiff was trafficked at the Fairfield hotel.

108. Defendant Marriott benefits financially from room rentals, reservation fees, and other incidentals recognized by renting rooms at the brand property in which the Plaintiff was commercially sex trafficked.

109. Defendant Marriott has benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

110. Defendant CHMB Florida directly benefited financially from room rentals, revenue from the rental fees charged for the rooms in which Plaintiff was trafficked at their hotel and other incidentals recognized by renting rooms.

111. Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided, enabled, and facilitated the sex trafficking of A.D. The Defendants leased rooms to A.D.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject A.D. to repeated exploitation as he forced her into sexual servitude.

112. Defendants profited from the sex trafficking of A.D. and knowingly or negligently facilitated A.D.'s continuous victimization. The Defendants actively ignored A.D. and her trafficker repeatedly visiting the hotel, often with different guests, avoiding eye contact, and dressing inappropriately.

113. The Defendants all financially benefited from the sex trafficking of

A.D., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

114. Defendants benefit from the steady stream of income that sex traffickers bring to their hotel brands.

115. Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

116. Defendants have long been aware that free Wi-Fi is attractive to traffickers yet failed to provide adequate security to protect Plaintiff, including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

117. Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

42

118.    Defendants maintained their deficiencies and knowingly benefited by maximizing profits by:

a.  Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b.  Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

c.  Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotel;

d.  Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e.  Lowering security costs by not having proper security measures,

including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation.

## CAUSES OF ACTION
### A.   COUNT ONE – 18 U.S.C. § 1595 ("TVPRA")
### (Against all Defendants)

119.   The Plaintiff A.D. incorporates each foregoing allegation.

120.   A.D. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

121.   The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. § 1591(a). At all relevant times, the Defendants breached this duty by participating in a venture which facilitated the harboring and providing of A.D. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

122.   The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of A.D.

on each occasion they received payment for rooms that she was being kept in at the Defendants' hotel. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.D.'s injuries and damages.

123.   A.D. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotel and property in violation of 18 U.S.C. § 1591(a).

## **PRAYER FOR RELIEF**

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a. All available compensatory damages for the described losses with respect to each cause of action;

b. past and future medical expenses, as well as the costs associated with past and future life care;

c. past and future emotional distress;

d. consequential and/or special damages;

e. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

   f.  disgorgement of profits obtained through unjust enrichment;

   g.  restitution;

   h.  punitive damages with respect to each cause of action;

   i.  reasonable and recoverable attorneys' fees;

   j.  costs of this action; and

   k.  pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated:  May 10, 2023                 **RESPECTFULLY SUBMITTED,**

                                     */s/ Kathryn L. Avila*
                                       **Kathryn L. Avila** (Fla. Bar No. 1019574)
                                       **Emmie J. Paulos** (Fla. Bar No. 99010)
                                       LEVIN PAPANTONIO RAFFERTY
                                       316 S. Baylen St. Suite 600
                                       Pensacola, Florida 32502
                                       T: 850-436-6246

F: 850-436-6271
E: kavila@levinlaw.com /
epaulos@levinlaw.com

***Attorneys for Plaintiff***